**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:11-cv-00244-MR-DLH**

| | | |
|---|---|---|
| **USA TROUSER, S.A. de C.V.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| | ) | |
| **INTERNATIONAL LEGWEAR GROUP,** | ) | |
| **INC., WILLIAM SHEELY, JOHN** | ) | |
| **SANCHEZ, and SCOTT ANDREWS,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Summary Judgment as to Plaintiff's Claims against Defendant Scott Andrews [Doc. 55]; Plaintiff's Motion for Summary Judgment as to Claims against the Individual Defendants John Sanchez and William Sheely [Doc. 57]; and the Individual Defendants' Motion for Summary Judgment [Doc. 60].

## I.    PROCEDURAL BACKGROUND

On September 6, 2011, the Plaintiff USA Trouser, S.A. de C.V. ("USA Trouser" or "Plaintiff") commenced this action in the Burke County General

Court of Justice, Superior Court Division, against International Legwear Group, Inc. ("ILG") and three former officers of ILG, William Sheely ("Sheely"), John Sanchez ("Sanchez"), and Scott Andrews ("Andrews") (collectively, "the Individual Defendants"). [Complaint, Doc. 1-1]. In the Complaint, the Plaintiff asserts eight causes of action against ILG and the Individual Defendants, including claims for breach of contract (First Claim for Relief); breach of fiduciary duty/constructive trust (Second Claim for Relief); fraud/fraudulent concealment/negligent misrepresentation (Third Claim for Relief); unfair and deceptive trade practices (Fourth Claim for Relief); breach of implied covenants of good faith and fair dealing (Fifth Claim for Relief); fraudulent and/or negligent failure to perform statutory duties (Sixth Claim for Relief); conversion (Seventh Claim for Relief); and fraudulent conveyance (Eighth Claim for Relief). [Id.]. The Defendants removed the action to this Court on September 21, 2011. [Doc. 1].

Shortly after removal, on October 14, 2011, the Plaintiff filed a motion seeking immediate discovery from the Defendants. For grounds, the Plaintiff argued that immediate discovery was necessary to preserve assets as well as material evidence. [Doc. 5]. On November 9, 2011, the Honorable Dennis L. Howell, United States Magistrate Judge, granted the

Plaintiff's motion for early discovery and directed the Defendants to respond to the Plaintiff's requests for production of documents within forty-five (45) days. [Doc. 10].

On December 29, 2011, Judge Howell entered a Pretrial Order and Case Management Plan setting deadlines of August 1, 2012 for the completion of discovery and September 1, 2012 for the filing of dispositive motions. [Doc. 18]. The case was scheduled for trial during the January 14, 2013 term. [Id.].

In the meantime, counsel for the Defendants moved to withdraw from representation of ILG. [Doc. 17]. The Court granted the motion to withdraw on January 11, 2012, and directed ILG to retain new counsel within ten (10) days. [Doc. 20]. When ILG failed to comply with the Court's Order, the Court ordered ILG's Answer to be stricken from the record, and for default to be entered against ILG. [Doc. 23]. The Clerk entered default against ILG on February 2, 2012. [Doc. 24].

On May 4, 2012, the Plaintiff filed a motion to compel ILG to comply fully with the Plaintiff's requests for the production of documents, which were the subject of the Order permitting early discovery. [Doc. 31]. On June 11, 2012, Judge Howell denied the Plaintiff's motion without prejudice

for failing to comply with the briefing requirements set forth in Local Rule 7.1. [Doc. 32].

Over thirty (30) days later, on July 13, 2012, the Plaintiff renewed its motion to compel against ILG. [Doc. 34]. At the same time, the Plaintiff filed a motion seeking an extension of the discovery deadline, from August 1, 2012 to February 1, 2013. [Doc. 33]. The individual Defendants also moved at the same time for leave to take the deposition of a third-party witness, Russell Reighley, after the deadline for the completion of fact discovery but prior to the filing of dispositive motions, due to an unforeseeable conflict in Mr. Reighley's schedule. [Doc. 37].

On July 19, 2012, Judge Howell entered an Order granting the Defendants' request to take Mr. Reighley's deposition after the close of discovery. [Doc. 38]. In that same Order, however, Judge Howell denied the Plaintiff's request for an extension of time to complete discovery, noting that the Plaintiff had not been diligent in pursuing discovery and that "the problems encountered by Plaintiff in completing discovery are largely a result of counsel's delay in filing appropriate motions to compel." [Doc. 38 at 2]. The Plaintiff objected to that Order and appealed the Magistrate Judge's ruling to this Court. [Doc. 42]. The Court overruled the Plaintiff's Objections on August 28, 2012. [Doc. 51].

Four days prior to the discovery deadline, on July 27, 2012, the Plaintiff filed a motion seeking leave to take the depositions of James A. Williams (ILG's CEO and President) and Defendant Andrews after the close of discovery. [Doc. 39]. The Magistrate Judge denied the Plaintiff's motion, again citing Plaintiff's failure to conduct discovery in a diligent manner. [Doc. 64]. The Plaintiff appealed that ruling of the Magistrate Judge's ruling. [Doc. 69].

On September 5, 2012, Judge Howell entered an Order denying Plaintiff's renewed motion to compel against ILG, stating that the Court "is not going to compel a party in default to respond to discovery. Rather, the proper course of action for Plaintiff to pursue is the filing of a motion for the entry of default judgment." [Doc. 65 at 1-2]. The Plaintiff also appealed that ruling by the Magistrate Judge. [Doc. 67].

The Plaintiff filed three motions for summary judgment on September 4, 2012: one against Defendant Andrews, one against Defendants Sheely and Sanchez, and one against ILG. [Docs. 54, 55, 57]. The Individual Defendants filed a motion for summary judgment as well. [Doc. 60].

The Court denied the Plaintiff's summary judgment motion as to ILG on the grounds that ILG was in default. [Doc. 76]. Responses to the remaining summary judgment motions were filed on September 21, 2012

[Docs. 72, 73, 74], and replies were filed on October 1, 2012 [Docs. 78, 79, 80].

The Court held a hearing on the pending motions on October 24, 2012. As a result of that hearing, the Court granted the Plaintiff leave to take the depositions of James A. Williams and Defendant Andrews and to seek non-party document production from ILG, Williams, and/or Richelieu Ltd. The parties were given the opportunity to file supplemental briefs following this discovery, and the summary judgment portion of the hearing was continued to November 21, 2012. [Doc. 88]. The parties filed their supplemental briefs on November 14, 2012. [Docs. 90, 91]. On November 21, 2012, the Court heard arguments from the parties on the summary judgment motions.

Having been fully briefed and argued, these motions are ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the case." News and Observer Pub. Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A

"genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." <u>Bouchat v. Baltimore Ravens Football Club, Inc.</u>, 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. <u>Id.</u>

> A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. Furthermore, neither unsupported speculation, nor evidence that is merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that reasonable minds could differ on a material point, then, regardless of any proof or evidentiary requirements imposed by the substantive law, summary judgment, if appropriate, shall be entered.

<u>Id.</u> (internal quotation marks and citations omitted).

In considering the facts for the purposes of a summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor.  <u>Adams v. Trustees of the Univ. of N.C.-Wilmington</u>, 640 F.3d 550, 556 (4th Cir. 2011).  Where both parties seek summary judgment, the Court "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law."  <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted).

## III.    FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiff, the following is a summary of the relevant facts.  USA Trouser is a sock and hosiery manufacturer, which was founded in 2009 by members of the Balas family in Mexico.  [Affidavit of Juan Balas ("Juan Balas Aff."), Doc. 54-4 at ¶12].  Previously, the Balas family had operated a company called Giovanni de Mexico, S.A. de C.V. ("Giovanni").  [<u>Id.</u> at ¶2].  Giovanni manufactured "George" brand trouser socks for a company called Ellis Hosiery ("Ellis"), which sold the socks to Wal-Mart.  [<u>Id.</u> at ¶3].

ILG was a hosiery products distribution company based in Hildebran, North Carolina.[1]  [Complaint, Doc. 1 at ¶¶2 and 11].  ILG purchased Ellis in 2004.  [Affidavit of Russ Reighley ("Reighley Aff."), Doc. 58-2 at ¶3].  Giovanni continued to manufacture socks for Ellis after its acquisition by ILG.  [Affidavit of Jaime Balas ("Jaime Balas Aff."), Doc. 54-1 at ¶14].

In February 2007, Jaime Balas met with two of ILG's representatives, Shannon Kennedy ("Kennedy") and Kevin Passarello ("Passarello").   At that time, Kennedy and Passarello told Jaime Balas that they, along with Scott Andrews, were the owners of ILG, and that they were authorized to speak on Andrews's behalf.   [Declaration of Jaime Balas ("Jaime Balas Decl."), Doc. 58-7 at ¶3].   Kennedy and Passarello told Jaime Balas that "they and Andrews guaranteed ILG's debts and that they would make sure that money owed to Giovanni and [the Balas] family would be paid."  [Id. at ¶5; Deposition of Jaime Balas ("Jaime Balas Dep."), Doc. 58-8 at 3].  Kennedy and Passarello further assured Jaime Balas that Wal-Mart and Payless were "large customers" who were capable of paying their bills in a timely manner; Jaime Balas interpreted this statement to mean that

_____

[1] ILG's corporate existence was terminated in May 2012.  [Notice of Termination, Doc. 61-2 at 82-83].

payments from Wal-Mart and Payless would always be made to Giovanni. [Jaime Balas Decl., Doc. 58-7 at ¶6].

In 2009, the Balas family decided to close Giovanni and start a new company, USA Trouser. [Jaime Balas Dep., Doc. 58-14 at 3-4]. USA Trouser continued to manufacture socks for Ellis/ILG. [Id.; Affidavit of Juan Balas ("Juan Balas Aff."), Doc. 54-4 at ¶¶12, 13].

In 2010, James A. Williams ("Williams") was hired to serve as ILG's Chief Executive Officer. [See Employment Agreement, Doc. 58-19]. Also in 2010, Defendant Sheely was hired to serve as ILG's Chief Operating Officer. [Affidavit of William Sheely ("Sheely Aff."), Doc. 61-2 at 70 ¶2]. Defendant Sanchez became ILG's Chief Financial Officer in January 2011. [Affidavit of John Sanchez ("Sanchez Aff."), Doc. 61-2 at 11 ¶2].

From 2006 to 2011, ILG was continually in a cash flow crisis and experienced several and repeated defaults on its payment obligations under certain credit and loan agreements that it had with its primary lender, a bank called CapitalSource ("CapSource"). [CapSource Letter dated July 6, 2011, Doc. 61-3 at 28-30; ILG Shareholders' Resolution, Doc. 63-2 at 80]. By 2011, ILG owed approximately $50 million to its secured creditors. [Id.]. ILG also had at least twenty (20) unsecured creditors, which included suppliers of hosiery products like the Plaintiff USA Trouser. [Sheely Aff.,

10

Doc. 61-2 at 70 ¶2]. In February 2011, ILG certified to CapSource that it was in default of its loan covenants. [Compliance Certificate, Doc. 58-25]. By a letter dated March 2, 2011, CapSource reiterated ILG's default. [Letter dated July 6, 2011, Doc. 58-26].

In April or May 2011, CapSource decided to restrict ILG's ability to access cash, which made it difficult for ILG to pay its vendors. [See Affidavit of Scott Andrews ("Andrews Aff."), Doc. 61-2 at ¶4]. By May 2011, ILG was no longer able to pay its creditors, including USA Trouser. As a result, ILG began seeking potential alternative lenders. [Id. at ¶5]. ILG retained a third party, Business Capital, to prepare an Offering Memorandum to distribute to potential lenders. [Id.]. Business Capital provided the Offering Memorandum to 52 potential lenders, and by June 11, 2011, ILG had received expressions of interest from eleven of those lenders. [Id. at ¶6].

In late May or early June 2011[2], Sanchez and Sheely went to Mexico City and met with Jaime, Juan, and Salomon Balas, the officers of USA Trouser. At the time of the meeting in Mexico City, ILG was about two

_____

[2] Juan Balas and Defendant Sanchez indicate in their affidavits that this meeting occurred on June 2, 2011. [Juan Balas Aff., Doc. 54-4 at ¶16; Sanchez Aff., Doc. 61-2 at ¶3; see also Sheely Aff., Doc. 61-2 at 70 ¶3 (indicating that meeting was in "early June")]. Jaime Balas states in his affidavit, however, that the meeting occurred on May 26, 2011. [Jaime Balas Aff., Doc. 54-1 at ¶32].

weeks late in paying approximately $200,000 to USA Trouser.  [Juan Balas Aff., Doc. 54-4 at ¶16].   Jaime Balas testified that during this meeting, Sanchez and Sheely made the following representations:

> In that meeting, John Sanchez and Bill Sheely told me, Juan and Salomon that the bank that ILG used was being difficult and that ILG did not want to use the bank any longer.  John and Bill told me that ILG would have no problems replacing ILG's bank, and that ILG's owners were wealthy and would ensure that payments would be made and that ILG would get [a] more cooperative bank.

[Jaime Balas Aff., Doc. 54-1 at ¶33].  Jaime Balas told Sheely and Sanchez that USA Trouser required consistent and constant payments to ensure that it could continue supplying products to ILG.  [Id. at ¶34].  Sheely and Sanchez assured Jaime Balas that "it would be no problem to pay ILG [sic] $100,000 of the money owed by Wednesday June 1, 2011" and that "ILG could make payments of at least $100,000 per week plus amounts for products being shipped according to production schedules until the account was current."  [Id. at ¶35].

Juan Balas testified in his Affidavit that during this meeting, Sheely and Sanchez told him and the other officers of USA Trouser that "ILG wanted to switch banks so that ILG would have a better bank for ILG's needs."  [Juan Balas Aff., Doc. 54-4 at ¶17].   According to Juan Balas,

Sheely and Sanchez further stated that "switching banks meant that ILG might need to pay USA Trouser out of the Wal-Mart and Payless cashflow only, and so ILG wanted to pay a weekly minimum of $100,000 until all amounts paid up and current." [Id.]. Juan Balas testified that Sheely and Sanchez further assured USA Trouser that "ILG was receiving payments from Wal-Mart and Payless, and that ILG had cash-flow sufficient to pay USA Trouser for all products ordered." [Id. at ¶16]. Sheely and Sanchez assured the USA Trouser officers that "there was nothing to worry to [sic] about, and that ILG's owners were committed to paying everything owed to USA Trouser." [Id. at ¶20].

Following the meeting in Mexico City, ILG did not make a $100,000 payment as promised. [Jaime Balas Aff., Doc. 54-1 at ¶37]. After Jaime Balas notified ILG that payment had not been made [Jaime Balas Aff., Doc. 54-1 at ¶38], ILG made a payment of $100,000 on June 3, 2011. [Affidavit of Salomon Balas ("Salomon Balas Aff."), Doc. 54-2 at ¶26]. ILG subsequently made additional payments of $33,573.68 on June 10, 2011; $136,529.82 on June 10, 2011; and $104,077.38 on June 17, 2011. [Id.]. During this time frame, ILG continued to order products from USA Trouser, and USA Trouser continued to manufacture and ship socks to ILG. [Jaime Balas Aff., Doc. 54-1 at ¶43; Salomon Balas Aff., Doc. 54-2 at ¶27].

13

Sanchez continued to assure USA Trouser that ILG was "trying to find the best of many banks offering credit to ILG." [Jaime Balas, Doc. 54-1 at ¶50].

Despite Sanchez's representations, ILG was unable to secure alternative financing. In an email to Andrews and Kennedy dated June 15, 2011, Sanchez outlined two "cash flow models" through the end of July 2011. Sanchez stated that the "best case" model provided for the availability of only $100,000 to pay creditors. Sanchez stated that this model would allow ILG "to get to the week of July 23rd but will jeopardize our vendor relationships and potential receipts of product." [June 15, 2011 Email, Doc. 58-36 at 3]. The other model provided for weekly minimum payments of $100,000 to USA Trouser and another vendor. Sanchez estimated that this model would have ILG "struggling to get through next week and completely under water the following week." [Id.]. Sanchez further acknowledged that CapSource "will not continue funding in a negative situation and I fear that if our cash availability continues to be positive, [CapSource] will increase the reserves in order to force action on our part." [Id.]. Despite Sanchez's dire cash flow projections, Sanchez wrote to USA Trouser during this time to assure it that ILG had "4 interested banks" and that ILG "will be selecting one this week to move

forward with. That process will take 4-6 weeks." [June 22, 2011 Email, Doc. 54-1 at 28].

On June 23, 2011, Sanchez notified USA Trouser for the first time that no payments could be made to vendors. [Email, Doc. 61-2 at 92]. In response, USA Trouser stopped further production for ILG. [Jaime Balas Aff., Doc. 54-1 at ¶52]. On or about June 30, 2011, Sheely told Jaime Balas that ILG's bank was going to release funds to USA Trouser. USA Trouser agreed to manufacture and supply products so long as the past due amounts were paid. Sheely assured Jaime Balas that "past due amounts would be paid very soon." [Id. at ¶53].

On July 5, 2011, Sheely and Sanchez called Jaime Balas and promised that ILG would be selecting a bank no later than Thursday, July 7, 2011. [Id. at ¶54]. Hearing nothing further from ILG, USA Trouser continued to press for assurances that payment would be made. [Id.]. In mid-July 2011, ILG told CapSource that ILG needed four more weeks to finalize an agreement with the potential lenders. [Andrews Aff., Doc. 61-2 at 6 ¶7; Sanchez Aff., Doc. 61-2 at 11 ¶26]. CapSource was unwilling to give ILG additional time, however, and decided to foreclose on all of ILG's assets. [Andrews Aff., Doc. 61-2 at 6 ¶7; Sanchez Aff., Doc. 6102 at 11 ¶26]. CapSource forced the liquidation of substantially all of ILG's assets

pursuant to an August 11, 2011 Asset Purchase Agreement between ILG and Gordon Brothers Commercial and Industrial, LLC ("Gordon Brothers"). [Asset Purchase Agreement, Doc. 61-2 at 114]. Gordon Brothers simultaneously sold ILG's assets to a separate entity known as Richelieu, which then began transacting business with the Plaintiff. [Jaime Balas Aff., Doc. 54-1 at ¶¶63-64].

## IV. DISCUSSION

In this action, the Plaintiff alleges that the Plaintiff and ILG were "strategic partners" to supply Wal-Mart and Payless with trousers socks, and that ILG fraudulently covered up its true financial condition so that ILG, as well as ILG's investors, officers and directors, could fraudulently sell ILG's assets. With respect to Defendant Andrews, the Plaintiff contends that Andrews personally guaranteed ILG's debts to induce Plaintiff to become ILG's strategic partner, and that Andrews then ignored his duties as director and de facto officer of ILG and caused ILG to breach its fiduciary duties to Plaintiff. The Plaintiff further alleges that Defendants Sanchez and Sheely intentionally and fraudulently withheld material information from the Plaintiff intending to induce Plaintiff to supply more products to ILG. The Plaintiff further contends that these Defendants violated their fiduciary duties to the Plaintiff by assisting in the sale of ILG's

assets and socks manufactured by Plaintiff to third parties. The Plaintiff contends that both Sanchez and Sheely are liable for ILG's debts as a result of their failure to fulfill their legal duties as officers of ILG. The Plaintiff further contends that Sanchez and Sheely are individually responsible for their tortious conduct, including fraud and unfair and deceptive trade practices.

### A. Breach of Contract (First Claim for Relief) and Breach of Implied Covenant of Good Faith and Fair Dealing (Fifth Claim for Relief)

In its First Claim for Relief, the Plaintiff asserts that all of the Defendants are liable to the Plaintiff for breach of contract. The Plaintiff cannot prevail on its breach of contract theory as to the Individual Defendants. It is undisputed that no contract existed between any one of the Individual Defendants and the Plaintiff. While the Plaintiff contends that Andrews is personally liable for ILG's debt, the forecast of evidence demonstrates that this "guaranty" was a vague oral statement made by parties other than Andrews with respect to ILG's obligations to *Giovanni*, not USA Trouser. The Plaintiff has presented no forecast of evidence from which a reasonable jury could conclude that Andrews personally guaranteed the debt of ILG to the Plaintiff. Even assuming that there were any evidence that Andrews had made such a promise to the Plaintiff, any

promise to stand for the debt of another must be in writing and signed by the guarantor in order to be enforceable.  <u>See</u> N.C. Gen. Stat. § 22-1.

The Plaintiff also cannot succeed on a theory of holding any of the Individual Defendants personally liable for the debts of ILG because Plaintiff does not allege in the Complaint that the corporate veil should be pierced.  Under Virginia[3] law, "officers and directors of an insolvent company may be liable to creditors only where . . . there are allegations and proof of self-dealing by the officers or directors."  <u>Bank of America v. Musselman</u>, 222 F.Supp.2d 792, 794 (E.D. Va. 2002).  Here, there is no forecast of evidence of any such self-dealing by any of the Individual Defendants.

Even if the Court assumes that ILG failed to pay for goods that Plaintiff shipped to ILG, there is simply no basis for holding any of the Individual Defendants liable for ILG's breach of contract. None of the Individual Defendants entered into a contract with Plaintiff.  None of the

---

[3]A federal court sitting in diversity must apply the substantive law of the forum in which it sits, including that forum's choice-of-law rules.  <u>See</u> <u>Klaxon v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).  If faced with a choice-of-law question regarding the equitable remedy of piercing the corporate veil, the North Carolina Supreme Court would adopt the internal affairs doctrine and apply the law of the state of incorporation.  <u>See</u> <u>Dassault Falcon Jet Corp. v. Oberflex, Inc.</u>, 909 F.Supp. 345, 349 (M.D.N.C. 1995).  As ILG was incorporated under the laws of the Commonwealth of Virginia, Virginia law should be applied in determining whether the corporate veil should be pierced in this case.

Individual Defendants made a promise to personally guarantee any debt that ILG allegedly owed to Plaintiff.  Further, there is no allegation in Plaintiff's Complaint that supports piercing the corporate veil so as to hold the Individual Defendants liable for ILG's alleged breach of a contract or contracts with the Plaintiff. As a result, the Court will grant summary judgment in favor of the Individual Defendants as to the Plaintiff's breach of contract claim.

Similarly, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails.  In North Carolina, a breach of the implied covenant of good faith and fair dealing "only arises where a party to a contract performs its contractual obligations in bad faith, and such breach of the implied duty serves as a cognizable basis for the breach of contract." Suntrust Mortg., Inc. v. Busby, 651 F.Supp.2d 472, 487 (W.D.N.C. 2009). As noted above, there is no evidence of the existence of any contract between Plaintiff and any Individual Defendant; thus, there is no attendant implied duty of good faith and fair dealing owed by any of the Individual Defendants. Further, the Plaintiff has failed to make any allegations that would support piercing the corporate veil so as to hold the Individual Defendants liable for breach of the implied duty of good faith and fair

dealing that allegedly arose from a contract between ILG and the Plaintiff. Accordingly, this claim too shall be dismissed.

## B.  Breach of Fiduciary Duty/Constructive Trust (Second Claim for Relief)

Under North Carolina law, a fiduciary relationship exists when one party is bound to act in good faith in the best interests of the other party, and that other party has placed confidence in the first party.  See Dalton v. Camp, 353 N.C. 647, 651, 548 S.E.2d 704, 707-08 (2001).  The Plaintiff contends that a fiduciary relationship arose in this case due to the "mutual interdependence" of USA Trouser and ILG. North Carolina courts have explicitly held, however, that a fiduciary relationship does not exist even between two "mutually interdependent businesses."  Tin Originals, Inc. v. Colonial Tin Works, Inc., 98 N.C. App. 663, 666, 391 S.E.2d 831, 833 (1990).

At best, USA Trouser was an unsecured creditor of ILG.  Generally, corporate directors do not owe a fiduciary duty to creditors of the corporation.  See N.C. Gen. St. § 55-8-30 (commentary); Keener Lumber Co., Inc. v. Perry, 149 N.C. App. 19, 29-30, 560 S.E.2d 817, 824-25 (2002). An exception to the general rule that directors of a corporation do not owe a fiduciary duty to creditors may occur under circumstances akin to a

"winding-up" or dissolution of the corporation.  Keener Lumber Co., 149

N.C. App. at 29-30, 560 S.E.2d at 824-25.  In determining whether a

corporation is in fact "winding-up," courts may look to the following factors:

> (1) whether the corporation was insolvent, or nearly insolvent, on a balance sheet basis; (2) whether the corporation was cash flow insolvent; (3) whether the corporation was making plans to cease doing business; (4) whether the corporation was liquidating its assets with a view of going out of business; and (5) whether the corporation was still prosecuting its business in good faith, with a reasonable prospect and expectation of continuing to do so.

Id. at 31, 560 S.E.2d at 825.  Such fiduciary duty is not present, however, if

there is simply a "balance sheet insolvency." Id.  As the Keener Lumber

Court explained, "'a corporation is not insolvent, as a general rule, merely

because it is embarrassed and cannot pay its debts as they become due,

or because its assets, if sold, would not bring enough to pay all its liabilities,

if it is still prosecuting its business in good faith, with a reasonable prospect

and expectation of continuing to do so.'"  Id. (quoting Whitley v. Carolina

Clinic, Inc., 118 N.C. App. 523, 527-28, 455 S.E.2d 896, 900 (1995)).

In the present case, the forecast of evidence, when viewed in the light

most favorable to the Plaintiff, demonstrates that the directors and officers

of ILG were actively trying to secure financing for the continued operation

of ILG up until the point that CapSource decided to foreclose.  At the time that ILG received the last shipment of goods from USA Trouser (in June 2011) up until the time ILG's lender decided to foreclose on its secured loans, ILG and the Individual Defendants were actively continuing ILG's operations.  Under these circumstances, a fiduciary duty simply did not arise with respect to ILG's creditors.

Even if a fiduciary relationship did exist, however, there is no evidence that the Individual Defendants breached such duty.  As the court in <u>Keener Lumber Co.</u> noted, when a fiduciary duty arises, directors of a corporation may prefer secured creditors over unsecured creditors.  149 N.C. App. at 33, 560 S.E.2d at 827.  It is undisputed that ILG had secured creditors, including CapSource, which were required to be paid before any unsecured creditors, such as USA Trouser.  In fact, the Asset Purchase Agreement demonstrates that CapSource held a lien on all of ILG's assets, and CapSource's security interest was recorded with the Virginia Secretary of State.  Moreover, the Asset Purchase Agreement and Limited Consent executed by ILG and Gordon Brothers show that the proceeds of the sale of ILG's assets were paid to CapSource, and not to any of the Individual Defendants.  This is uncontroverted.

Plaintiff also argues that a fiduciary duty arose from an alleged "business partnership" between ILG and USA Trouser. The Plaintiff, however, conceded at the hearing that there was no such partnership or joint venture between the parties. In any event, the Plaintiff has presented no forecast of evidence showing any sharing of profits or co-ownership of the businesses between the Plaintiff and any of the Individual Defendants. Generally speaking, sharing of profits and co-ownership of the businesses are required to establish a business partnership under North Carolina law. See Best Cartage, Inc. v. Stonewall Packaging, LLC, 727 S.E.2d 291, 299 (N.C. Ct. App. 2012).

The Plaintiff's claim for a constructive trust is also premised on a theory of a fiduciary duty. For the reasons stated above, the Plaintiff has failed to present a forecast of evidence of circumstances from which any such fiduciary duty could arise, and thus Plaintiff's attempt to impose a constructive trust on the Individual Defendants also fails as a matter of law.

For these reasons, the Plaintiff's claim for breach of fiduciary duty/constructive is dismissed.

**C.    Fraud,    Fraudulent    Concealment,    and    Negligent Misrepresentation (Third Claim for Relief)**

According to the Complaint, the Plaintiff relies on three alleged misrepresentations in support of its claims sounding in fraud.  First, the Plaintiff asserts that Defendants Sheely and Sanchez falsely informed Plaintiff on June 2, 2011 that ILG's cash flow situation was improving when they had specific information regarding ILG's financials which, if fully disclosed to Plaintiff, would have resulted in the Plaintiff refusing to ship socks to ILG.  [Complaint, Doc. 1-1 at ¶¶ 107, 115, 116].  Second, the Plaintiff asserts that Defendants ILG, Sheely, and Sanchez fraudulently promised to make payments of $100,000 per week to the Plaintiff on in June 2011 but knew that such payments were not going to be made.  [Id. at ¶¶ 108, 113].  Third, the Plaintiff alleges that the Individual Defendants fraudulently concealed the sale of Plaintiff's socks to Richelieu.  [Id. at ¶¶ 109-11].

To prove a claim for fraud in North Carolina, a plaintiff must demonstrate: (1) a material misrepresentation of a past or existing fact; (2) that the representation was definite and specific; (3) that it was made "with knowledge of its falsity or in culpable ignorance of its truth"; (4) that the misrepresentation was made with the "intention that it should be acted

upon"; (5) that the recipient of the misrepresentation reasonably relied and acted upon the misrepresentation; and (6) that the misrepresentation resulted in damage to the recipient. Horack v. Southern Real Estate Co. of Charlotte, Inc., 150 N.C. App. 305, 313, 563 S.E.2d 47, 53 (2002).

Notably, none of the alleged misrepresentations or acts of fraud is alleged to have been committed by Andrews personally. It is undisputed that Andrews had no contact or communications with the Plaintiff. Accordingly, the Court will grant summary judgment in favor of Andrews as to this claim.

With regard to Sanchez and Sheely, the Court concludes that there are genuine disputes of fact regarding their affirmative representations about ILG's financial condition and ability to continue to pay USA Trouser. A jury question is also presented with respect to the Defendants' promises to make payments of $100,000 per week. Here, the Plaintiff has presented a sufficient forecast of evidence to show that Sheely and Sanchez made these representations with the knowledge that ILG did not have the ability to make such payments within the time stated. Under North Carolina law, a promissory representation (i.e., a promise to do a certain act in the future) can serve as a basis for a fraud claim, even though it does not constitute the representation of a subsisting fact, if "there is evidence of scienter

tending to show that the promisor intended to deceive and had no intention of performing the promise at the time he made it." Synergy Financial, L.L.C. v. Zarro, 329 F. Supp. 2d 701, 711 (W.D.N.C. 2004) (citation omitted). Based on the forecast of evidence presented, it is possible that a jury could find that when the promise was made to pay the $100,000 per week that Sanchez and Sheely knew that ILG had no ability to perform, and thus the promise was made without the intent to perform. Accordingly, the Court will deny the Individual Defendants' motion for summary judgment with respect to this aspect of the Plaintiff's fraud claim as to Sanchez and Sheely.

To the extent that the Plaintiff's claim of fraud is based on an alleged duty to disclose that the Individual Defendants concealed the sale of Plaintiff's socks to Richelieu, this claim must be dismissed. In order to prevail on a fraudulent concealment claim, the Plaintiff must demonstrate that all or some of the Defendants had a duty to disclose material information, as silence is fraudulent only when there is a duty to speak. See Griffin v. Wheeler-Leonard & Co., 290 N.C. 185, 198, 225 S.E.2d 557, 565 (1976). The concealed information "must relate to a material matter known to the party and which it is his legal duty to communicate to the other . . . whether the duty arises from a relation of trust, from confidence,

inequality of condition or knowledge, or other attendant circumstances."
Breeden v. Richmond Community College, 171 F.R.D. 189, 194 (M.D.N.C.
1997) (quoting Setzer v. Old Republic Life Ins. Co., 257 N.C. 396, 399, 126
S.E.2d 135, 137 (1962)). One of the instances in which a legal duty to
disclose arises is when a fiduciary relationship exists between the parties.
Breeden, 171 F.R.D. at 194 n.4.   As explained above, the forecast of
evidence establishes that a fiduciary relationship did not exist between the
Plaintiff and ILG, much less between Plaintiff and the Individual
Defendants.   Also, it is undisputed that the inventory of socks was not sold
to Richelieu until August 2011, long after the Plaintiff shipped its last
products to ILG.   As such, even if there were any duty to provide this
information, the Plaintiff did nothing in reliance on its ignorance of this fact.

The Plaintiff's negligent misrepresentation claim also lacks merit.   In
order to prove a negligent misrepresentation, the Plaintiff must show that:
(1) it relied on information prepared by one or more of the Individual
Defendants, (2) its reliance was justifiable and detrimental, (3) one or more
of the Individual Defendants owed USA Trouser a duty to prepare the
information with reasonable care, and (4) one or more of the Individual
Defendants breached the duty when he prepared the information without
reasonable care.   See Oberlin Capital, L.P. v. Slavin, 147 N.C. App. 52, 58,

554 S.E.2d 840, 846 (2001). The duty required to make the claim may either come from statute, contract, or "may be implied from attendant circumstances." Id. at 59, 554 S.E.2d at 846.

As explained above, the forecast of evidence does not demonstrate that ILG or the Individual Defendants owed a duty to the Plaintiff that would give rise to a claim for negligent misrepresentation. At best, the Plaintiff and ILG were mutually interdependent businesses engaged in arms'-length transactions. North Carolina courts have held that this type of business relationship does not give rise to a fiduciary duty. Tin Originals, 98 N.C. App. at 666, 391 S.E.2d at 833.

For these reasons, the Court concludes that summary judgment should be granted to the Individual Defendants with respect to the Plaintiff's claims of fraudulent concealment and negligent misrepresentation. In light of the genuine issues of material fact related to the Plaintiff's claim of fraud, summary judgment will be denied, and the Plaintiff's fraud claim will proceed to trial.

### D. Violation of Alleged Statutory Duties Claim (Sixth Claim for Relief)

The Plaintiff cannot prevail on its claim that ILG's directors and officers failed to perform statutory duties by continuing to operate ILG

during insolvency when "winding down" was required by law.  The duties of directors and officers pursuant to N.C. Gen. Stat. § 55-8-30 and N.C. Gen. Stat. § 55-8-42 are duties that directors and officers of a corporation owe to the corporation, not to the corporation's creditors.  <u>See</u> N.C. Gen. Stat. § 55-8-30 (requiring directors to act in a manner in which they believe is in the best interests of the corporation); N.C. Gen. Stat. § 55-8-42 (requiring the same of officers).  As such, the Plaintiff lacks standing to prevail on a claim of "failure to perform statutory duties."  The Individual Defendants are entitled to summary judgment on this claim.

### E.   Conversion and Fraudulent Conveyance Claims (Seventh and Eighth Claims for Relief)

Based on the allegations of the Plaintiff's Complaint, the Plaintiff is not asserting its conversion claim against the Individual Defendants but instead is only alleging that ILG is liable for conversion. [Complaint, Doc. 1-1 at ¶142]. Because the Plaintiff's complaint is devoid of any allegations that support piercing the corporate veil to hold the Individual Defendants liable for torts allegedly committed by ILG, the Individual Defendants are entitled to summary judgment on this claim as well.

The Plaintiff's claim for fraudulent conveyance also must fail.  In North Carolina, a fraudulent conveyance is defined as follows:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1)    With intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2)    Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> a.    Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> b.    Intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

N.C. Gen. Stat. § 39-23.4(a).

To support its claim of fraudulent conveyance, the Plaintiff relies on the Asset Purchase Agreement. There is no forecast of evidence that indicates that the Individual Defendants were involved in negotiating the Asset Purchase Agreement or authorizing any conveyance of socks manufactured by the Plaintiff and shipped to ILG. Indeed, with respect to Defendants Andrews and Sheely, the Asset Purchase Agreement was not even completed until after Andrews and Sheely had already resigned from ILG. The Asset Purchase Agreement is signed by Williams, the sole

remaining member of the Board of Directors of ILG as of the date of the Asset Purchase Agreement. Moreover, the sale of ILG's inventory was the result of a liquidation forced by ILG's secured creditor, CapSource. The Plaintiff has presented no forecast of evidence that the transfer of this inventory was done with the intent to hinder, delay, or defraud a creditor, as is required by statute to prove a claim for fraudulent conveyance.[4] For these reasons, the Individual Defendants are entitled to summary judgment on the Plaintiff's claim for fraudulent conveyance.

### F.     Chapter 75 Claim (Fourth Claim for Relief)

In order to prove a claim under Chapter 75, the Plaintiff must show that "(1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." <u>Dalton</u>, 353 N.C. at 656, 548 S.E.2d at 711; N.C. Gen. Stat. § 75-1.1. Insofar as genuine issues of fact

---

[4] The Plaintiff argues that the liquidation of ILG had the effect of transferring assets to a "friendly" party for nominal consideration and placing its assets beyond the reach of creditors, such as the Plaintiff. [See Response, Doc. 72]. This argument, however, is simply not supported by the record. The forecast of evidence does not suggest any "friendly" relationship between ILG and Gordon Brothers and/or Richelieu. Nor does the record support a finding that the consideration provided for ILG's assets was nominal. It must be noted that even if ILG's assets had been liquidated for $23.6 million, as the Plaintiff suggests would have been a reasonable price, the Plaintiff would still be in the same position in which it finds itself, as ILG owed its secured creditors more than $50 million. The Plaintiff, as an unsecured creditor, would still have received nothing from the liquidation.

remain as to the Plaintiff's fraud claim, the Court will also deny summary judgment with respect to the Plaintiff's claim under Chapter 75. In all other respects, however, summary judgment will be granted in favor of the Defendants on this claim. Accordingly, the Plaintiff's Chapter 75 claim will proceed to trial, but only with respect to the allegations of fraud on the part of Defendants Sheely and Sanchez.[5]

## V.    ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Summary Judgment as to Plaintiff's Claims against Defendant Scott Andrews [Doc. 55] and the Plaintiff's Motion for Summary Judgment as to Claims against the Individual Defendants John Sanchez and William Sheely [Doc. 57] are **DENIED**.

**IT IS FURTHER ORDERED** that the Individual Defendants' Motion for Summary Judgment [Doc. 60] is **GRANTED IN PART** and **DENIED IN PART**. Specifically, the Individual Defendants' Motion for Summary Judgment is **DENIED** with respect to the Plaintiff's claims for fraud, and unfair and deceptive trade practices based on fraud, against Defendants

---

[5] At the summary judgment hearing, the Plaintiff argued that the Individual Defendants can be held personally liable for the unfair and deceptive trade practices of ILG. The Court requested additional briefing from the parties on this issue. Having reviewed the parties' submissions, the Court finds no support in North Carolina law for this novel theory.

Sheely and Sanchez.  The Individual Defendants' Motion for Summary Judgment with respect to all claims against Defendant Andrews is **GRANTED**.  Except as heretofore specifically denied, the Individual Defendants' Motion for Summary Judgment is hereby **GRANTED**.

**IT IS SO ORDERED.**

Signed: December 13, 2012

Martin Reidinger
United States District Judge