**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NO. 1:11-cv-00244-MR-DLH**


| | |
|---|---|
| USA TROUSER, S.A. de C.V.,    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | |
| vs.    ) | **O R D E R** |
| ) | |
| ) | |
| INTERNATIONAL LEGWEAR GROUP, ) | |
| INC., WILLIAM SHEELY, JOHN    ) | |
| SANCHEZ, and SCOTT ANDREWS,    ) | |
| ) | |
| Defendants.    ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Default

Judgment as to Claims Against Defendant International Legwear Group,

Inc. ("ILG") pursuant to Rule 55(b)(2) [Doc. 101].

## I.     PROCEDURAL BACKGROUND

On September 6, 2011, the Plaintiff USA Trouser, S.A. de C.V. ("USA

Trouser" or "Plaintiff") commenced this action in the Burke County General

Court of Justice, Superior Court Division, against International Legwear

Group, Inc. ("ILG") and three former officers of ILG, William Sheely

("Sheely"), John Sanchez ("Sanchez"), and Scott Andrews ("Andrews")

(collectively, "the Individual Defendants"). [Complaint, Doc. 1-1]. In the verified[1] Complaint, the Plaintiff asserts eight causes of action against ILG and the Individual Defendants, including claims for breach of contract (First Claim for Relief); breach of fiduciary duty/constructive trust (Second Claim for Relief); fraud/fraudulent concealment/negligent misrepresentation (Third Claim for Relief); unfair and deceptive trade practices (Fourth Claim for Relief); breach of implied covenants of good faith and fair dealing (Fifth Claim for Relief); fraudulent and/or negligent failure to perform statutory duties (Sixth Claim for Relief); conversion (Seventh Claim for Relief); and fraudulent conveyance (Eighth Claim for Relief). [Id.]. The Defendants removed the action to this Court on September 21, 2011 [Doc. 1] and filed their respective Answers on November 23, 2011 [Docs. 11, 12, 13, 14].

On January 11, 2012, counsel for the Defendants moved to withdraw from representation of ILG. [Doc. 17]. The Court granted the motion to withdraw and directed ILG to retain new counsel within ten (10) days. [Doc. 20]. When ILG failed to comply with the Court's Order, the Court ordered ILG's Answer to be stricken from the record, and for default to be

---

[1] The verification of the Complaint was not included among the state court pleadings filed with the Notice of Removal. The Plaintiff subsequently filed a copy of the verification as Document 92 in this case.

entered against ILG.  [Doc. 23].  The Clerk entered default against ILG on February 2, 2012.  [Doc. 24].

The Plaintiff filed three motions for summary judgment on September 4, 2012: one against Defendant Andrews, one against Defendants Sheely and Sanchez, and one against ILG. [Docs. 54, 55, 57].  The Individual Defendants filed a motion for summary judgment as well.  [Doc. 60].

On September 24, 2012, the Court denied the Plaintiff's summary judgment motion as to ILG on the grounds that ILG was in default and that the appropriate procedure for the Plaintiff to follow was to pursue a default judgment upon the conclusion of the case against the Individual Defendants.  [Doc. 76].

On December 14, 2012, the Court entered an Order denying the Plaintiff's Motions for Summary Judgment and granting in part and denying in part the Individual Defendants' motions.  Specifically, the Individual Defendants' Motion for Summary Judgment was denied with respect to the Plaintiff's claims against Defendants Sheely and Sanchez for fraud and unfair and deceptive trade practices based on fraud.  The Individual Defendants' Motion for Summary Judgment was granted with respect to all claims against Defendant Andrews.  [Doc. 94].

On January 3, 2013, pursuant to the Plaintiff's Acceptance of Offer of Judgment [Doc. 99], the Clerk entered judgment against Defendants Sheely and Sanchez in the amount of $277,185.82. [Doc. 100]. Thereafter, the Plaintiff filed the present motion seeking the entry of a default judgment against the sole remaining Defendant, ILG. [Doc. 101]. On April 16, 2013, the Court ordered the Plaintiff to supplement its motion, particularly its request for attorney's fees. [Doc. 104]. The Plaintiff filed a supplement in accordance with the Court's Order on April 30, 2013. [Docs. 105, 106].

This matter is now ripe for disposition.

## II.     STANDARD OF REVIEW

Rule 55 of the Federal Rules of Civil Procedure provides for the entry of a default when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). Once a defendant has been defaulted, the plaintiff may then seek a default judgment. If the plaintiff's claim is for a sum certain or can be made certain by computation, the Clerk of Court may enter the default judgment. Fed. R. Civ. P. 55(b)(1). In all other cases, the plaintiff must apply to the Court for a default judgment. Fed. R. Civ. P. 55(b)(2). The Court may then conduct a hearing to determine the amount of damages, establish the truth of any

allegation by evidence, or investigate any other matter necessary to enter or effectuate judgment. Id. "Upon default, facts alleged in the complaint are deemed admitted and the appropriate inquiry is whether the facts as alleged state a claim." GlobalSantaFe Corp. v. Globalsantafe.com, 250 F.Supp.2d 610, 612 n.3 (E.D. Va. 2003). While damages need not be proved with "mathematical precision," Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C., 174 N.C. App. 49, 61, 620 S.E.2d 222, 231 (2005), such damages must be proven to at least a "reasonable certainty." State Props., L.L.C. v. Ray, 155 N.C. App. 65, 76, 574 S.E.2d 180, 188 (2002).

## III.  FACTUAL BACKGROUND

Based on the undisputed evidence before the Court, the following is a summary of the relevant facts. USA Trouser is a sock and hosiery manufacturer, which was founded in 2009 by members of the Balas family in Mexico. [Affidavit of Juan Balas ("Juan Balas Aff."), Doc. 54-4 at ¶12]. Previously, the Balas family had operated a company called Giovanni de Mexico, S.A. de C.V. ("Giovanni"). [Id. at ¶2]. Giovanni manufactured "George" brand trouser socks for a company called Ellis Hosiery ("Ellis"), which sold the socks to Wal-Mart. [Id. at ¶3].

ILG was a hosiery products distribution company based in Hildebran, North Carolina.[2]  [Complaint, Doc. 1 at ¶¶2 and 11].  ILG purchased Ellis in 2004.  [Affidavit of Russ Reighley ("Reighley Aff."), Doc. 58-2 at ¶3].  Giovanni continued to manufacture socks for Ellis after its acquisition by ILG.  [Affidavit of Jaime Balas ("Jaime Balas Aff."), Doc. 54-1 at ¶14].

In February 2007, Jaime Balas met with two of ILG's representatives, Shannon Kennedy ("Kennedy") and Kevin Passarello ("Passarello").  At that time, Kennedy and Passarello told Jaime Balas that they, along with Scott Andrews, were the owners of ILG, and that they were authorized to speak on Andrews's behalf.  [Declaration of Jaime Balas ("Jaime Balas Decl."), Doc. 58-7 at ¶3].  Kennedy and Passarello told Jaime Balas that "they and Andrews guaranteed ILG's debts and that they would make sure that money owed to Giovanni and [the Balas] family would be paid."  [Id. at ¶5; Deposition of Jaime Balas ("Jaime Balas Dep."), Doc. 58-8 at 3].  Kennedy and Passarello further assured Jaime Balas that Wal-Mart and Payless were "large customers" who were capable of paying their bills in a timely manner; Jaime Balas interpreted this statement to mean that

---

[2] ILG's corporate existence was terminated in May 2012.  [Notice of Termination, Doc. 61-2 at 82-83].

payments from Wal-Mart and Payless would always be made to Giovanni. [Jaime Balas Decl., Doc. 58-7 at ¶6].

In 2009, the Balas family decided to close Giovanni and start a new company, USA Trouser. [Jaime Balas Dep., Doc. 58-14 at 3-4]. USA Trouser assumed the manufacture of socks for Ellis/ILG. [Id.; Affidavit of Juan Balas ("Juan Balas Aff."), Doc. 54-4 at ¶¶12, 13].

In 2010, James A. Williams ("Williams") was hired to serve as ILG's Chief Executive Officer. [See Employment Agreement, Doc. 58-19]. Also in 2010, Defendant Sheely was hired to serve as ILG's Chief Operating Officer. [Affidavit of William Sheely ("Sheely Aff."), Doc. 61-2 at 70 ¶2]. Defendant Sanchez became ILG's Chief Financial Officer in January 2011. [Affidavit of John Sanchez ("Sanchez Aff."), Doc. 61-2 at 11 ¶2].

From 2006 to 2011, ILG was continually in a cash flow crisis and experienced several and repeated defaults on its payment obligations under certain credit and loan agreements that it had with its primary lender, a bank called CapitalSource ("CapSource"). [CapSource Letter dated July 6, 2011, Doc. 61-3 at 28-30; ILG Shareholders' Resolution, Doc. 63-2 at 80]. By 2011, ILG owed approximately $50 million to its secured creditors. [Id.]. ILG also had at least twenty (20) unsecured creditors, which included suppliers of hosiery products like the Plaintiff USA Trouser. [Sheely Aff.,

Doc. 61-2 at 70 ¶2]. In February 2011, ILG certified to CapSource that it was in default of its loan covenants. [Compliance Certificate, Doc. 58-25]. By a letter dated March 2, 2011, CapSource reiterated ILG's default. [Letter dated July 6, 2011, Doc. 58-26].

In April or May 2011, CapSource decided to restrict ILG's ability to access cash, which made it difficult for ILG to pay its vendors. [See Affidavit of Scott Andrews ("Andrews Aff."), Doc. 61-2 at ¶4]. By May 2011, ILG was no longer able to pay its creditors, including USA Trouser. As a result, ILG began seeking potential alternative lenders. [Id. at ¶5]. ILG retained a third party, Business Capital, to prepare an Offering Memorandum to distribute to potential lenders. [Id.]. Business Capital provided the Offering Memorandum to 52 potential lenders, and by June 11, 2011, ILG had received expressions of interest from eleven of those lenders. [Id. at ¶6].

In late May or early June 2011[3], Sanchez and Sheely went to Mexico City and met with Jaime, Juan, and Salomon Balas, the officers of USA Trouser. At the time of the meeting in Mexico City, ILG was about two

---

[3] Juan Balas and Defendant Sanchez indicate in their affidavits that this meeting occurred on June 2, 2011. [Juan Balas Aff., Doc. 54-4 at ¶16; Sanchez Aff., Doc. 61-2 at ¶3; see also Sheely Aff., Doc. 61-2 at 70 ¶3 (indicating that meeting was in "early June")]. Jaime Balas states in his affidavit, however, that the meeting occurred on May 26, 2011. [Jaime Balas Aff., Doc. 54-1 at ¶32].

weeks late in paying approximately $200,000 to USA Trouser.  [Juan Balas Aff., Doc. 54-4 at ¶16].  Jaime Balas testified that during this meeting, Sanchez and Sheely made the following representations:

> In that meeting, John Sanchez and Bill Sheely told me, Juan and Salomon that the bank that ILG used was being difficult and that ILG did not want to use the bank any longer.  John and Bill told me that ILG would have no problems replacing ILG's bank, and that ILG's owners were wealthy and would ensure that payments would be made and that ILG would get [a] more cooperative bank.

[Jaime Balas Aff., Doc. 54-1 at ¶33].  Jaime Balas told Sheely and Sanchez that USA Trouser required consistent and constant payments to ensure that it could continue supplying products to ILG.  [Id. at ¶34].  Sheely and Sanchez assured Jaime Balas that "it would be no problem to pay ILG [sic] $100,000 of the money owed by Wednesday June 1, 2011" and that "ILG could make payments of at least $100,000 per week plus amounts for products being shipped according to production schedules until the account was current."  [Id. at ¶35].

Juan Balas testified in his Affidavit that during this meeting, Sheely and Sanchez told him and the other officers of USA Trouser that "ILG wanted to switch banks so that ILG would have a better bank for ILG's needs."  [Juan Balas Aff., Doc. 54-4 at ¶17].  According to Juan Balas,

Sheely and Sanchez further stated that "switching banks meant that ILG might need to pay USA Trouser out of the Wal-Mart and Payless cashflow only, and so ILG wanted to pay a weekly minimum of $100,000 until all amounts paid up and current." [Id.]. Juan Balas testified that Sheely and Sanchez further assured USA Trouser that "ILG was receiving payments from Wal-Mart and Payless, and that ILG had cash-flow sufficient to pay USA Trouser for all products ordered." [Id. at ¶16]. Sheely and Sanchez assured the USA Trouser officers that "there was nothing to worry to [sic] about, and that ILG's owners were committed to paying everything owed to USA Trouser." [Id. at ¶20].

Following the meeting in Mexico City, ILG did not make a $100,000 payment as promised. [Jaime Balas Aff., Doc. 54-1 at ¶37]. After Jaime Balas notified ILG that payment had not been made [Jaime Balas Aff., Doc. 54-1 at ¶38], ILG made a payment of $100,000 on June 3, 2011. [Affidavit of Salomon Balas ("Salomon Balas Aff."), Doc. 54-2 at ¶26]. ILG subsequently made additional payments of $33,573.68 on June 10, 2011; $136,529.82 on June 10, 2011; and $104,077.38 on June 17, 2011. [Id.]. During this time frame, ILG continued to order products from USA Trouser, and USA Trouser continued to manufacture and ship socks to ILG. [Jaime Balas Aff., Doc. 54-1 at ¶43; Salomon Balas Aff., Doc. 54-2 at ¶27].

Sanchez continued to assure USA Trouser that ILG was "trying to find the best of many banks offering credit to ILG." [Jaime Balas, Doc. 54-1 at ¶50]. Despite Sanchez's representations, ILG was unable to secure alternative financing. In an email to Andrews and Kennedy dated June 15, 2011, Sanchez outlined two "cash flow models" through the end of July 2011. Sanchez stated that the "best case" model provided for the availability of only $100,000 to pay creditors. Sanchez stated that this model would allow ILG "to get to the week of July 23rd but will jeopardize our vendor relationships and potential receipts of product." [June 15, 2011 Email, Doc. 58-36 at 3]. The other model provided for weekly minimum payments of $100,000 to USA Trouser and another vendor. Sanchez estimated that this model would have ILG "struggling to get through next week and completely under water the following week." [Id.]. Sanchez further acknowledged that CapSource "will not continue funding in a negative situation and I fear that if our cash availability continues to be positive, [CapSource] will increase the reserves in order to force action on our part." [Id.]. Despite Sanchez's dire cash flow projections, Sanchez wrote to USA Trouser during this time to assure it that ILG had "4 interested banks" and that ILG "will be selecting one this week to move forward with. That process will take 4-6 weeks." [June 22, 2011 Email, Doc. 54-1 at 28].

On June 23, 2011, Sanchez notified USA Trouser for the first time that no payments could be made to vendors. [Email, Doc. 61-2 at 92]. In response, USA Trouser stopped further production for ILG. [Jaime Balas Aff., Doc. 54-1 at ¶52]. On or about June 30, 2011, Sheely told Jaime Balas that ILG's bank was going to release funds to USA Trouser. USA Trouser agreed to manufacture and supply products so long as the past due amounts were paid. Sheely assured Jaime Balas that "past due amounts would be paid very soon." [Id. at ¶53].

On July 5, 2011, Sheely and Sanchez called Jaime Balas and promised that ILG would be selecting a bank no later than Thursday, July 7, 2011. [Id. at ¶54]. Hearing nothing further from ILG, USA Trouser continued to press for assurances that payment would be made. [Id.]. In mid-July 2011, ILG told its original lender, CapSource, that ILG needed four more weeks to finalize an agreement with the potential lenders. [Andrews Aff., Doc. 61-2 at 6 ¶7; Sanchez Aff., Doc. 61-2 at 11 ¶26]. CapSource was unwilling to give ILG additional time, however, and decided to foreclose on all of ILG's assets. [Andrews Aff., Doc. 61-2 at 6 ¶7; Sanchez Aff., Doc. 6102 at 11 ¶26]. CapSource forced the liquidation of substantially all of ILG's assets pursuant to an August 11, 2011 Asset Purchase Agreement between ILG and Gordon Brothers Commercial and Industrial, LLC

("Gordon Brothers"). [Asset Purchase Agreement, Doc. 61-2 at 114]. Gordon Brothers simultaneously sold ILG's assets to a separate entity known as Richelieu, which then began transacting business with the Plaintiff. [Jaime Balas Aff., Doc. 54-1 at ¶¶63-64].

## IV. DISCUSSION

Even though ILG has defaulted, the Plaintiff is not automatically entitled to a judgment on all of its claims against ILG. See DIRECTV, Inc. v. Pernites, 200 F. App'x 257, 258 (4th Cir. 2006) (quoting Nishimatsu Constr. Co. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975) ("A defendant's default does not in itself warrant the court entering a default judgment. There must be sufficient basis in the pleadings for the judgment entered."). Further, the Plaintiff proceeded with its claims against the Individual Defendants, many of which claims were dismissed on the merits. The Plaintiff is not entitled to a judgment against a defaulting defendant that would be inconsistent with the prior determinations of this Court regarding the claims against other defendants. See Frow v. De La Vega, 82 U.S. (15 Wall.) 552, 554 (1872) ("It would be unreasonable to hold, that because one defendant had made default, the plaintiff should have a decree even against him, where the court is satisfied from the proofs offered by the other, that in fact the plaintiff is not entitled to a decree.") (citation omitted).

Therefore, the merits of each of the Plaintiff's claims against ILG must be analyzed, taking as true only those allegations that are consistent with the prior proceedings in this action.

**A.    Breach of Contract (First Claim for Relief) and Breach of Implied Covenant of Good Faith and Fair Dealing (Fifth Claim for Relief)**

To establish a claim for breach of contract under North Carolina law, a plaintiff must show: (1) the existence of a valid contract and (2) a breach of the terms of that contract.  Charlotte Motor Speedway, LLC v. County of Cabarrus, 748 S.E.2d 171, 175 (N.C. Ct. App. 2013).

In its First Claim for Relief, the Plaintiff asserts three different theories in support of its breach of contract claim.  First, the Plaintiff alleges that it had a contract with ILG pursuant to which ILG agreed to pay for the products that it ordered within thirty (30) days of shipment and invoice, and that ILG breached the terms of this contract by failing to pay for products within the time required.  [Doc. 1 at ¶¶68, 71].  As its second theory, the Plaintiff alleges that ILG committed a breach of contract by failing to pay $100,000 to USA Trouser on June 3, 2011.  [Id. at ¶70].  Finally, the Plaintiff alleges as a third theory that ILG breached the contracts by causing the products to be sold to a third party other than Wal-Mart or Payless.  [Id. at ¶72].

The Plaintiff has failed to demonstrate that it is entitled to a judgment as a matter of law on its second and third theories. With respect to its second theory, the Plaintiff's own evidence at summary judgment established that ILG made a payment of $100,000 on June 3, 2011. [Salomon Balas Aff., Doc. 54-2 at ¶ 26]. As for its third theory, the Plaintiff has made no allegations or has presented no evidence that it had a contract with ILG which prohibited the sale of any USA Trouser products to third parties other than Wal-Mart or Payless, and thus the Plaintiff cannot establish that ILG's actions in this regard constituted a breach of contract. Accordingly, the Plaintiff's breach of contract claim, at least as it pertains to these two theories, must fail.

With respect to the Plaintiff's first theory, the Plaintiff has presented evidence to show that it had a contractual arrangement with ILG whereby ILG would pay the Plaintiff within thirty (30) days for any products ordered. The Plaintiff further has presented evidence, through its verified Complaint, that from May 23, 2011 through June 23, 2011, ILG ordered and received $655,256.16 worth of socks from the Plaintiff but that ILG did not pay for such goods. [Complaint, Doc. 1 at ¶¶61, 71, 76; Due Account, Doc. 1-1 at 24]. Accordingly, the Plaintiff has presented sufficient evidence to entitle it to a judgment in the amount of $655,256.16 on its breach of contract claim.

The Plaintiff also claims a total of $968,000 in consequential damages arising from ILG's breach of contract, including (1) $175,000 related to continued pay of workers from late June and July 2011; (2) $50,000 in lost productivity and re-training costs; (3) $138,000 in raw material purchase costs, interest and "changed terms because of failure to timely pay"; (4) $25,000 in damages caused by obsolete raw material and packaging; (5) lost profits from June 2011 through September 2011 in the amount of $180,000; and (6) $400,000 "for personal loans which were required to keep the Plaintiff open due to ILG's failure to pay." [Doc. 102 at 9-10]. To prove the amount of consequential damages it suffered, the Plaintiff relies upon the Affidavit of Jaime Balas. Upon reviewing Mr. Balas's Affidavit, the Court concludes that while the Plaintiff has shown that it suffered a monetary loss as a result of ILG's breach of contract, it has failed to prove its consequential damages "with sufficient certainty and specificity" to permit recovery of such damages here. B.B. Walker Co. v. Ashland Chem. Co., 474 F.Supp. 651, 663-64 (M.D.N.C. 1979) (denying claim for lost profits where court "was not furnished with sufficient evidence as to the labor cost, factory overhead expense, etc., upon which to base a finding as to lost profits, past or future, which would warrant a specific finding in this regard"). For instance, with regard to the claims for lost

profits and lost productivity, the Plaintiff has failed to show how these amounts were calculated or even that such claims rise to a level above pure speculation. The claims related to raw materials and labor are expenses that the Plaintiff would appear to have incurred in *performing* the contract at issue. As such, the Plaintiff does not explain how these constitute damages. Regarding the personal loans, the Plaintiff provides nothing as to how such loss is calculated. Moreover, these would appear to be losses of members of the Balas family, who are not plaintiffs in this action. Accordingly, the Plaintiff's request for an award of consequential damages is denied.

In addition to asserting a breach of contract claim, the Plaintiff also asserts a claim for breach of the duties of good faith and fair dealing. Under North Carolina law, a breach of the implied covenant of good faith and fair dealing "arises where a party to a contract performs its contractual obligations in bad faith, and such breach of the implied duty serves as a cognizable basis for the breach of contract." Suntrust Mortg., Inc. v. Busby, 651 F.Supp.2d 472, 487 (W.D.N.C. 2009). Even assuming that the Plaintiff's verified Complaint establishes ILG's bad faith in breaching the parties' agreement, the Plaintiff has not set forth any evidence to establish any additional damages arising from ILG's breach of these duties.

Accordingly, the Plaintiff's recovery shall be limited to $655,256.16 for its contractual claims.

## B. Breach of Fiduciary Duty/Constructive Trust (Second Claim for Relief)

Under North Carolina law, a fiduciary relationship exists when one party is bound to act in good faith in the best interests of the other party, and that other party has placed confidence in the first party. See Dalton v. Camp, 353 N.C. 647, 651, 548 S.E.2d 704, 707-08 (2001). The Plaintiff contends that a fiduciary relationship arose in this case due to the "mutual interdependence" of USA Trouser and ILG. North Carolina courts have explicitly held, however, that a fiduciary relationship does not exist even between two "mutually interdependent businesses." Tin Originals, Inc. v. Colonial Tin Works, Inc., 98 N.C. App. 663, 666, 391 S.E.2d 831, 833 (1990). While the Plaintiff argued that a fiduciary duty arose from an alleged "business partnership" between ILG and USA Trouser, the Plaintiff conceded at summary judgment that there was no such partnership or joint venture between the parties. In any event, the Plaintiff has not alleged any sharing of profits or co-ownership of the businesses between the Plaintiff and ILG. Generally speaking, sharing of profits and co-ownership of the businesses are required to establish a business partnership under North

Carolina law.  See Best Cartage, Inc. v. Stonewall Packaging, LLC, 727

S.E.2d 291, 299 (N.C. Ct. App. 2012).

The Plaintiff's claim for a constructive trust is also premised on a

theory of a fiduciary duty.  For the reasons stated above, the Plaintiff has

failed to present evidence of circumstances from which any such fiduciary

duty could arise, and thus Plaintiff's attempt to impose a constructive trust

on ILG also fails as a matter of law.

For these reasons, the Plaintiff's claim for breach of fiduciary

duty/constructive trust is dismissed.

### C. Fraud, Fraudulent Concealment, and Negligent Misrepresentation (Third Claim for Relief) and Violations of Chapter 75 (Fourth Claim for Relief)

To prove a claim for fraud in North Carolina, a plaintiff must

demonstrate: (1) a material misrepresentation of a past or existing fact; (2)

that the representation was definite and specific; (3) that it was made "with

knowledge of its falsity or in culpable ignorance of its truth"; (4) that the

misrepresentation was made with the "intention that it should be acted

upon"; (5) that the recipient of the misrepresentation reasonably relied and

acted upon the misrepresentation; and (6) that the misrepresentation

resulted in damage to the recipient.  Horack v. Southern Real Estate Co. of

Charlotte, Inc., 150 N.C. App. 305, 313, 563 S.E.2d 47, 53 (2002).

According to the Complaint, the Plaintiff relies on three alleged misrepresentations in support of its claims sounding in fraud. First, the Plaintiff asserts that Defendants Sheely and Sanchez, acting as officers of ILG, falsely informed Plaintiff on June 2, 2011 that ILG's cash flow situation was improving when they had specific information regarding ILG's financials which, if fully disclosed to Plaintiff, would have resulted in the Plaintiff refusing to ship socks to ILG. [Complaint, Doc. 1-1 at ¶¶ 107, 115, 116]. Second, the Plaintiff asserts that ILG, through Sheely and Sanchez, fraudulently promised to make payments of $100,000 per week to the Plaintiff on in June 2011 but knew that such payments were not going to be made. [Id. at ¶¶ 108, 113]. Third, the Plaintiff alleges that ILG, through Sheely and Sanchez, fraudulently concealed the sale of Plaintiff's socks to Richelieu. [Id. at ¶¶ 109-11].

Taking the factual allegations of the Plaintiff's Complaint to be true, the Court concludes that ILG, through Sanchez and Sheely, made affirmative representations about ILG's financial condition and ability to continue to pay USA Trouser. ILG further fraudulently promised to make payments to USA Trouser of $100,000 per week. These misrepresentations were made with the knowledge that ILG did not have the ability to make such payments within the time stated. Under North

Carolina law, a promissory representation (i.e., a promise to do a certain act in the future) can serve as a basis for a fraud claim, even though it does not constitute the representation of a subsisting fact, if "there is evidence of scienter tending to show that the promisor intended to deceive and had no intention of performing the promise at the time he made it." Synergy Financial, L.L.C. v. Zarro, 329 F. Supp. 2d 701, 711 (W.D.N.C. 2004) (citation omitted).

To the extent that the Plaintiff's claim of fraud is based on an alleged duty to disclose that ILG concealed the sale of Plaintiff's socks to Richelieu, this claim must be dismissed. In order to prevail on a fraudulent concealment claim, the Plaintiff must demonstrate that ILG had a duty to disclose material information, as silence is fraudulent only when there is a duty to speak. See Griffin v. Wheeler-Leonard & Co., 290 N.C. 185, 198, 225 S.E.2d 557, 565 (1976). The concealed information "must relate to a material matter known to the party and which it is his legal duty to communicate to the other . . . whether the duty arises from a relation of trust, from confidence, inequality of condition or knowledge, or other attendant circumstances." Breeden v. Richmond Community College, 171 F.R.D. 189, 194 (M.D.N.C. 1997) (quoting Setzer v. Old Republic Life Ins. Co., 257 N.C. 396, 399, 126 S.E.2d 135, 137 (1962)). One of the instances

in which a legal duty to disclose arises is when a fiduciary relationship exists between the parties. <u>Breeden,</u> 171 F.R.D. at 194 n.4. As explained above, the Plaintiff's evidence establishes that a fiduciary relationship did not exist between the Plaintiff and ILG. Also, it is undisputed that the inventory of socks was not sold to Richelieu until August 2011, long after the Plaintiff shipped its last products to ILG. As such, even if there were any duty to provide this information, the Plaintiff did nothing in reliance on its ignorance of this fact.

The Plaintiff's negligent misrepresentation claim also lacks merit. In order to prove a negligent misrepresentation, the Plaintiff must show that: (1) it relied on information prepared by ILG, (2) its reliance was justifiable and detrimental, (3) ILG owed USA Trouser a duty to prepare the information with reasonable care, and (4) ILG breached the duty when it prepared the information without reasonable care. <u>See</u> <u>Oberlin Capital, L.P. v. Slavin</u>, 147 N.C. App. 52, 58, 554 S.E.2d 840, 846 (2001). The duty required to make the claim may either come from statute, contract, or "may be implied from attendant circumstances." <u>Id.</u> at 59, 554 S.E.2d at 846.

As explained above, the Plaintiff has failed to demonstrate that ILG owed a duty to USA Trouser that would give rise to a claim for negligent misrepresentation. At best, USA Trouser and ILG were mutually

interdependent businesses engaged in arms'-length transactions. North Carolina courts have held that this type of business relationship does not give rise to a fiduciary duty. <u>Tin Originals</u>, 98 N.C. App. at 666, 391 S.E.2d at 833. For these reasons, the Court concludes that the Plaintiff's claims of fraudulent concealment and negligent misrepresentation against ILG must be dismissed.

USA Trouser is entitled to judgment as to its fraud claim, however, insofar as such claim relates to ILG's material misrepresentations of its financial condition/ability to pay and its fraudulent promise to pay USA Trouser $100,000 per week.

Insofar as USA Trouser has established entitlement to relief on its claim of fraud, the Court will also grant judgment with respect to its claim under Chapter 75. To the extent, however, that the Chapter 75 claim against ILG is premised upon allegations of a breach of fiduciary duty, constructive trust, conversion, or fraudulent conveyance, such claim must be dismissed.

As for the Plaintiff's damages arising from ILG's fraudulent and deceptive acts, the Plaintiff claims damages in the amount of $2,186,735.20. [Doc. 102 at 16]. Beyond the amount which the Plaintiff was not paid for delivered product ($655,256.16), the Court cannot discern

from the record any evidentiary basis for the amount of damages claimed. Accordingly, the Court will award the Plaintiff $655,256.16 in damages for its fraud claim and Chapter 75 claim. Such award shall be trebled in accordance with the provisions of N.C. Gen. Stat. § 75-16.

### D. Conversion and Fraudulent Conveyance Claims (Seventh and Eighth Claims for Relief)

In its Seventh Claim for Relief, the Plaintiff alleges that ILG's sale of its inventory to a third party, and its failure to return the inventory to the Plaintiff without paying for the same, amounts to unlawful conversion. [Complaint, Doc. 1-1 at ¶142].

Under North Carolina law, "conversion is defined as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of the owner's rights." King v. Brooks, 736 S.E.2d 788, 791 (N.C. Ct. App. 2012). In the present case, the Plaintiff has presented nothing that indicates that the Plaintiff owned the sock inventory at the time of the liquidation. Rather, the Plaintiff was an unsecured creditor of ILG, the indebtedness having arisen with the transfer and delivery of the socks to ILG. The sale of the socks by ILG was the result of a liquidation forced by ILG's secured creditor, CapSource, which had a security interest in all of

ILG's inventory.  Under these circumstances, Plaintiff cannot prevail on a conversion theory, as the Plaintiff has failed to demonstrate any assertion by ILG of dominion or control over any inventory of the Plaintiff.

The Plaintiff's claim for fraudulent conveyance likewise must fail.  In North Carolina, a fraudulent conveyance is defined as follows:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1)    With intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2)    Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> a.    Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> b.    Intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

N.C. Gen. Stat. § 39-23.4(a).

In its Complaint, the Plaintiff alleges that the sale of ILG's inventory of socks to a third party other than Wal-Mart or Payless, and ILG's failure to pay the Plaintiff the proceeds from such sale, amounts to a fraudulent

conveyance under § 39.23.4(a). [Complaint, Doc. 1-1 at ¶145]. The Plaintiff further alleges that the transfer and sale of such inventory was made with the intent to hinder, delay, or defraud the Plaintiff as a creditor. [Id. at ¶146]. As noted above, however, the Plaintiff has itself shown that the sale of ILG's inventory was the result of a liquidation forced by ILG's secured creditor, CapSource. The Plaintiff argues that the liquidation of ILG had the effect of transferring assets to a "friendly" party for nominal consideration and placing its assets beyond the reach of creditors, such as the Plaintiff. [See Response, Doc. 72]. This argument, however, is simply not supported by the record before the Court. There is no evidence to suggest any "friendly" relationship between ILG and Gordon Brothers and/or Richelieu. Nor does the record support a finding that the consideration provided for ILG's assets was nominal. It must be noted that even if ILG's assets had been liquidated for $23.6 million, as the Plaintiff suggests would have been a reasonable price, the Plaintiff would still be in the same position in which it finds itself, as ILG owed its secured creditors more than $50 million. The Plaintiff, as an unsecured creditor, would still have received nothing from the liquidation.

For these reasons, the Plaintiff's claims for conversion and fraudulent conveyance must be dismissed.

### E.    Attorneys' Fees and Costs

Finally, the Plaintiff seeks an award of $213,977.95 in attorney's fees and costs pursuant to N.C. Gen. Stat. § 75-16.1.  [Doc. 102 at 21].

The determination of a reasonable fee award under Chapter 75 is a matter of discretion with the Court.  Shepard v. Bonita Vista Props., L.P., 191 N.C. App. 614, 625, 664 S.E.2d 388, 396 (2008).  In determining the amount of reasonable attorneys' fees to be awarded, courts typically apply the lodestar method, whereby the Court multiplies the number of reasonable hours expended by a reasonable hourly rate.  See Robinson v. Equifax Info. Services, 560 F.3d 235, 243 (4th Cir. 2009).  The party seeking an award of attorneys' fees has the burden of demonstrating a reasonable fee.  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).

In order to be eligible for an award of attorney's fees under Chapter 75, the Plaintiff must be the "prevailing party."  In order to be considered "prevailing," a plaintiff must prove not only that the defendant violated the Act, but also that the plaintiff suffered "an actual injury as a result of the violation."  Llera v. Sec. Credit Sys., Inc., 93 F.Supp.2d 674, 677 (W.D.N.C. 2000); Mayton v. Hiatt's Used Cars, Inc., 45 N.C. App. 206, 212, 262 S.E2.d 860, 864 (1980).  Here, the Plaintiff has presented sufficient evidence that ILG violated Chapter 75 and that the Plaintiff incurred

damages of $655,256.16 as a result.  Accordingly, an award of attorney's fees related to the prosecution of the Chapter 75 claim against ILG is appropriate.

The Court now turns to the challenging task of calculating such an award, a task made all the more difficult by the manner in which the Plaintiff has chosen to pursue its claim.  In its original motion for default judgment, the Plaintiff requested an award of $213,977.95 in fees based solely on the affidavit of Plaintiff's counsel.  [See Doc. 101-1].  Counsel did not attach any billing records to support the fee request, but rather offered to provide such records if requested by the Court. [Id.].  Counsel further made no effort to estimate the amount of time devoted to prosecution of the Chapter 75 claim against ILG, even though this claim is concededly the only claim entitling the Plaintiff to recovery of attorney's fees in this case.  Rather than deny the Plaintiff's request for fees in light of these obvious deficiencies, the Court ordered the Plaintiff to supplement its motion and specifically "to provide a fair estimate of the percentage of the total fees related to the claims upon which fees may be awarded, as well as the percentage of fees attributable to pursuing the action against ILG as opposed to the other defendants in the case."  [Doc. 104 at 2].

In response, Plaintiff's counsel refused to offer any such estimates, arguing that limiting the fee award solely to work performed on the Chapter 75 claim would be inappropriate, as this claim was inextricably intertwined with the other claims asserted against ILG. Counsel further objected to awarding fees only for work performed with respect to the claims pending against ILG, despite the fact that the case continued on for nearly a year after ILG's default. Despite these objections, counsel submitted that if the fee award were to be limited to work performed on "ILG only matters," such award would amount to $91,366.56.[4] [Doc. 105 at 11]. Notably, however, this figure included work performed by counsel *after* ILG was defaulted in February 2012, work which was necessarily directed to prosecuting the

---

[4] Counsel states that this figure represents all work performed in the case, as to all Defendants, prior to the Order allowing ILG's counsel to withdraw, but that it also includes work performed in filing subsequent "[m]otions and briefing relating exclusively to ILG as well as efforts to obtain 30(b)(6) deposition." Counsel offers no explanation as to how such work relates to the Plaintiff's Chapter 75 claim against ILG, or why he should be entitled to recover fees for work performed after ILG was defaulted. Further, he fails to cite to the particular billing records that support this request. Instead, he cites generally to the 70-plus pages of billing records attached to his supplemental affidavit, leaving it to the Court to review the records line-by-line in an effort to make a determination as to whether the requested fees are warranted.

In conducting this line-by-line examination, the Court notes that counsel's records are fraught with errors. For example, counsel's time sheet indicates that the filing of the motion for default judgment was in January 2012, not 2013. [Doc. 106-2 at 34]. In that same entry, counsel claims to have spent .98 hours in completing the motion, but claims a fee of $600 for that work, an amount which is double his claimed hourly rate. [Id.]. While this may have just been a random miscalculation, it calls into doubt the overall accuracy of counsel's claimed fees.

claims against the other defendants in this case. Accordingly, the Court declines to award the full amount claimed by counsel for "ILG only matters." Rather, the award will be limited to the time spent on ILG-related claims up until the entry of default, and for any work performed on the motion for default judgment filed on January 22, 2013.[5]

Upon careful review of the billing records of counsel and excluding any entries which appear to relate only to other defendants in this action, the Court will award the Plaintiff fees for 91.72 hours of work performed by Attorney Rogers and 6.84 hours of work performed by independent contractor attorney Alain LaMarque in prosecuting claims against ILG through the entry of default on February 2, 2012, as well as filing the motion for default judgment.

Having determined the reasonable number of hours, the Court now turns to the determination of a reasonable hourly rate. Upon reviewing the Plaintiff's Motion, as supplemented, the Court concludes that the $300 hourly rate requested by attorney Matthew K. Rogers, and the $50 hourly rate requested for work performed by independent contractor attorney Alain LaMarque are reasonable and consistent with prevailing market rates in the

_____

[5] The Plaintiff filed an earlier motion for default judgment, which was denied as premature. [Doc. 85]. The Court will not allow the recovery of fees with respect to the filing of this motion.

Asheville, North Carolina, area.[6]    Accordingly, the Court will award attorney's fees to the Plaintiff as follows:

| | | |
|---|---|---|
| Attorney Rogers (91.72 hours x $300.00) | | $27,516.00 |
| Attorney LaMarque (6.84 hours x $50.00) | | $    342.00 |
| **TOTAL** | | **$27,858.00** |

Finally, the Plaintiff requests an award of costs in the amount of $16,214.13.  Having reviewed counsel's records, the Court will award the Plaintiff $230.00 in costs for filing and service fees incurred.  See 28 U.S.C. § 1920(1) (allowing for taxing of "[f]ees of the clerk and marshal"); LCvR 54.1(F)(5) (allowing recovery for fees for the service of summons and subpoenas).    The Plaintiff has failed to demonstrate that the other expenses claimed, including expenses for "depositions, transcripts, video depositions . . . and PACER usage" [Doc. 106 at 6], are related specifically to the prosecution of the Plaintiff's claims against ILG, especially as the majority of such expenses were incurred after default was entered against ILG on February 2, 2012.

---

[6] The Court need not address the reasonableness of the hourly rates claimed by Plaintiff's counsel's legal staff, as none of these staff members appear to be paralegals. Therefore, any hours expended by them is considered overhead for the firm and is not recoverable.  See Irwin Indus. Tool Co. v. Worthington Cyclinders Wis., LLC, 747 F.Supp.2d 568, 591 (W.D.N.C. 2010).  The Court further need not address the reasonableness of the hourly rate of counsel's summer associate, as he appeared to have performed work only after the entry of default against ILG.  [See Doc. 106-5 at 2].

## V.    ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Default Judgment as to Claims Against Defendant International Legwear Group, Inc. ("ILG") pursuant to Rule 55(b)(2) [Doc. 101] is **GRANTED**, and the Plaintiff is hereby awarded Six Hundred and Fifty-Five Thousand Two Hundred and Fifty-Six Dollars and Sixteen Cents ($655,256.16) in damages against International Legwear Group, Inc., which damages are trebled pursuant to N.C. Gen. Stat. § 75-16 for a total award of One Million Nine Hundred and Sixty-Five Thousand Seven Hundred and Sixty-Eight Dollars and Forty-Eight Cents ($1,965,768.48).

**IT IS FURTHER ORDERED** that the Plaintiff is hereby awarded attorney's fees in the amount of Twenty-Seven Thousand Eight Hundred and Fifty-Eight Dollars ($27,858.00) against the Defendant International Legwear Group, Inc. and an award of costs in the amount of Two Hundred and Thirty Dollars ($230.00).

A Judgment consistent with this Order is entered simultaneously herewith.

**IT IS SO ORDERED.**          Signed: March 24, 2014

Martin Reidinger
United States District Judge